UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

LDR, a minor by his mother and guardian,    )
ROSHONDA R. WAGNER,                          )
                                             )
        Plaintiff,                           )
                                             )
        v.                                   )    Case No. 3:13-CV-966-JD
                                             )
CAROLYN W. COLVIN,                           )
Acting Commissioner of Social Security,      )
                                             )
        Defendant.                           )

## OPINION AND ORDER

On September 11, 2013, Plaintiff LDR, a minor, brought this lawsuit by his mother and

guardian, Roshonda R. Wagner, seeking review of the final decision of the Defendant

Commissioner of Social Security (Commissioner) [DE 1]. The Commissioner filed an Answer

on March 7, 2014 [DE 14]. On July 12, 2014, LDR's counsel filed his opening brief [DE 22], to

which the Commissioner responded on November 10, 2014 [DE 30]. LDR's reply was filed on

November 25, 2014 [DE 31]. Accordingly, the matter is now ripe for decision. Jurisdiction is

predicated on 42 U.S.C. §§ 405(c) and 1383.

### I. Procedural History

On September 25, 2009, Roshonda Wagner applied for Supplemental Security Income on

behalf of her son, LDR, alleging that his disability began on April 1, 2008 (Tr. 118-123). His

application was denied initially on January 4, 2010, and again upon reconsideration on February

7, 2011 (Tr. 66-69, 75-77). After at least twice receiving written notices of her right to be

represented (Tr. 81-87, 96-109), on January 24, 2012, Ms. Wagner waived the right to

representation at the hearing which was held before Administrative Law Judge Jennifer Fisher

(Tr. 30-62, 112-113). On April 18, 2012, ALJ Fisher issued a decision denying the claim (Tr. 11-25). The Appeals Council denied a request for review on July 16, 2013, making the ALJ's decision the final decision of the Commissioner (Tr. 1-6).

## II. Facts

In seeking disability for her son, Ms. Wagner claims that LDR suffers from severe asthma, ear infections, and behavioral issues. The ALJ agreed that LDR suffered from severe impairments, including asthma, sleep apnea (OSA), language delay, and behavior disorder. But the ALJ believed that his impairments did not meet, medically equal, or functionally equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 416.924, 416.925, 416.926, 416.926a. As a result of the three-step process employed for determining whether an individual under the age of eighteen is disabled, *see* 20 C.F.R. § 416.924(a), the ALJ determined that LDR was not entitled to disability benefits—a decision which is now before the Court for review.

### A.  Medical Background

Shortly after his birth on March 19, 2008, LDR suffered from tracheomalacia (abnormal collapse of the tracheal walls), exertional dyspnea (breathlessness), and difficulty with asthma (Tr. 241, 246). In April, Dr. Andrew G. Lapadat, M.D., LDR's pediatrician, prescribed albuterol (Tr. 196) and referred LDR to Dr. Michael Agostino, M.D., in order to treat his throat and breathing problems (Tr. 191).

Dr. Agostino noted that at eight weeks old, LDR breathed noisily and with mild distress when active (Tr. 182-191). Dr. Agostino observed that LDR's epiglottis was in a tight omega shape, a condition seen in laryngomalacia (congenital softening of the tissues of the voice box). Dr. Agostino had LDR discontinue his breathing treatments and required him to sleep as upright

2

as possible. At four months old, LDR was emitting a high-pitched crowing sound when he inhaled. Holding him upright relieved the noise but albuterol did not. Dr. Agostino diagnosed LDR with congenital anomaly of the larynx.

In August 2008, Dr. Lapadat diagnosed the dry patches on LDR's back, chest, abdomen, and upper arms as eczema (Tr. 194). In November 2008, LDR was noted as having a prolonged upper respiratory infection marked by coughing and wheezing, along with a body rash[1] (Tr. 192, 230-231). The following month, LDR had renewed stridor (a harsh vibrating noise when breathing caused by obstruction of the windpipe or larynx) and high-pitched inhalation (Tr. 241).

At LDR's 12-month physical, Dr. Lapadat observed that LDR's ears were still bothering him (Tr. 226), and LDR's suffering from bilateral otitis media continued (Tr. 220, 222, 224). By September and October 2009, LDR had multiple visits to the doctor on account of ear infections, fussiness, and banging of his head (Tr. 217-218). In October, LDR was actually taken to the emergency room for banging his head and a high fever likely associated with a virus (Tr. 200, 206).

Dr. Lapadat referred LDR to Savita Collins, M.D. (of the South Bend Clinic's Department of Otolaryngology), for an evaluation of his chronic otitis media with effusion (fluid remaining in the middle ear for a long time or returning over and over again) (Tr. 200-202). On October 21, 2009, Dr. Collins evaluated LDR and observed bilateral effusion with more mucoid effusion on the left than the right. LDR's head banging was associated with the pain he felt from infection and nasal drainage. Sound field testing results showed scores in the 20 to 30 dB

---

[1]At one point, Dr. Lapadat discussed with Ms. Wagner there being a relationship between atopy (hypersensitive reactions such as eczema), recurrent upper respiratory infections, and obstructive sleep apnea (Tr. 308).

(decibel) range, with LDR having a speech reception threshold of 10.[2]  Dr. Collins noted that the fluid from behind LDR's eardrums had not cleared since May, even with approximately six courses of antimicrobial therapy and rocephin injections. Because LDR had effusions for over three months with ineffective treatment, Dr. Collins recommended ear tube placement despite the risks.  On November 3, 2009, Dr. Collins performed LDR's ear surgery involving pressure equalization tube placement in both ears (Tr. 209-211, 233).

The following day, Dr. Lapadat wrote in relevant part:

> [LDR] is a 19-month-old patient here at Bristol Street Pediatrics who has a past medical history significant for tracheomalacia as well as mild intermittent asthma. He also has a history of recurrent otitis media . . . . Of his chronic issues, his tracheomalacia has resolved. His asthma is, again, mild, intermittent, and requiring treatments on an as needed basis only at this point, and hopefully once he has tubes or outgrows his chronic ear problems that will not be a problem either. I see no reason why he will not lead a fully healthy, normal, productive life.

(Tr. 213).

Three consultive examinations were then performed (Tr. 234-252), along with the completion of a disability evaluation form by state agents (Tr. 253-258).  Specifically, Clinical Psychologist Hugh Van Auken Sr.'s November 11, 2009, consultative examination involved testing of LDR via the Bayley Scales of Infant and Toddler Development (Tr. 234-239). All of LDR's scores fell at or below the 25th percentile, and LDR specifically ranked in the third percentile for language and in the one-tenth percentile for his social-emotional skills.  LDR's overall skill level combined to form a General Adaptive Composite score that fell only in the second percentile.   Psychologist Van Auken summarized his findings by stating:

---

[2]Audiologists consider 0-25 decibels to be normal hearing in children. Encyclopedia of Children's Health, http://www.healthofchildren.com/G-H/Hearing-Impairment.html (last visited March 16, 2015).

Consultation findings reveal the presence of significant delays in language, social-emotional, and adaptive behavioral development for [LDR]. His level of functioning in these areas appears to lag behind more than 95% of his age mates. [LDR] evidences very poor receptive and expressive language skills, speaking only one word. He also appears to be an active, impulsive lad evidencing weaknesses in social, behavioral, and psychological functioning relative to his age mates.

Psychologist Hugh Van Auken's diagnostic impression was that LDR suffered from cognitive disorder NOS (characterized by suboptimal language, social-emotional, and adaptive behavioral development), along with frequent ear infections and asthma.

On December 10, 2009, Ralph Inabnit, D.O., conducted a physical examination of LDR, which resulted in his concluding that LDR suffered from asthma, bronchospasm, chronic otitis media, myringotomy (eardrum) tubes bilaterally, and possible speech delay (Tr. 240-248). He recommended speech therapy, a followup on his ear tube placement, and a chest x-ray for his asthma.

Licensed Speech/Language Pathologist Juliann Ford's December 10, 2009, speech pathology evaluation indicated that LDR was "not using the variety of phonemes in speech that most children his age produce." (Tr. 249-252). She believed that LDR was delayed by 7-8 months in his receptive language skills and 8-9 months in his expressive language skills.

Despite these medical findings, reviewing state agents Steven Roush, M.D., F. Kladder, Ph.D., and J. Hoke, CCC-SLP, opined that LDR's behavior appeared typical for a child his age; and while he may have language delays, he did not have impairments that met, medically equaled, or functionally equaled one of the Listings (Tr. 253-258). It was specifically found that LDR had "marked" limitations with acquiring and using information, but "less than marked" limitations with attending/completing tasks and interacting/relating with others, and "no limitation" with respect to his health and physical well-being, moving about and manipulating

objects, and caring for himself.  Thus, on January 4, 2010, LDR's disability application was initially denied.

Yet, even after having the ear tube placement surgery in November 2009, LDR continued to have problems and presented at the emergency room in the midst of a bronchiolitis flare-up in February 2010 (Tr. 280).  In March, LDR was noted to be picking at his ears (Tr. 276).  By August, LDR still had a cough and shortness of breath, especially at night (Tr. 278, 320-321). LDR was diagnosed as having no improvement with his asthma.  In September, LDR presented to Dr. Dhaemers with dried blood in his right ear (Tr. 265-267, 319). His mother reported that after receiving a bump from playing with his brother, LDR pulled and tugged at his right ear, causing blood to form in the ear canal.  LDR's mother was told to continue using ciprodex ear drops.  In October, LDR was still pulling at his ears (Tr. 264).  Despite this evidence, Dr. Lapadat wrote a letter dated December 8, 2010, indicating that LDR did not have any issues that would prevent him from functioning normally (Tr. 275).

On February 1, 2011, Licensed Speech/Language Pathologist Juliann Ford performed another speech pathology evaluation in which she concluded that while LDR was 34 months old, his receptive language skills were at 28-30 months and his expressive language skills were at 34-36 months (Tr. 286-288). And although LDR's speech had improved after his ear tube placement surgery, Ford noted that LDR "demonstrates significant behavioral issues. He is not able to engage with people easily and is nonresponsive to directives."

Just prior to the denial of LDR's application upon reconsideration in early February 2011, state agents P. Kelley, M.D., Kenneth Neville, Ph.D., and M. Thomas, CCC-SLP, opined that LDR's behavior appeared typical for a child his age; and while he may have language delays, he did not have impairments that met, medically equaled, or functionally equaled one of

the Listings (Tr. 268-273). It was specifically found that LDR had "less than marked" limitations with his health and physical well-being, acquiring and using information, attending/completing tasks and interacting/relating with others, and "no limitation" with respect to his ability to move about and manipulate objects and care for himself.

In April 2011, Dr. Collins noted that LDR's speech had improved, but his mother was concerned about his behavior (Tr. 408). A hearing test revealed normal results. In May, LDR presented to Dr. Dhaemers of the Bristol Street Pediatric Associates with a week-long cough and wheezing, which wasn't improving with the use of albuterol (Tr. 316-318). LDR was given oraped (or prednisolone) and pulmicort (or budesonide). It was also noted that while sleeping LDR would snore and stop breathing at times, so he was referred to an ear, nose, and throat specialist. By August, LDR's mother noticed an odor and really dark brown wax coming from LDR's ears (Tr. 402). Following another hearing test, tympanometry results suggested a left abnormal eardrum, but it was reported that his pressure equalizing tube was functioning as it should on the right (Tr. 396-97). LDR was prescribed ciprodex ear drops and told to return in a month.

When LDR presented to Dr. Ansari in September 2011, after a weekend with a tight chest, coughing, and wheezing (Tr. 339), Dr. Ansari observed a mild to moderate asthma exacerbation, with medications being only partly effective. LDR was given prednisolone at that time (Tr. 341-342). Yet again, just over a month later, a foul-smelling odor and drainage began emitting from both of LDR's ears (right more than left), for which Dr. Collins prescribed ciprodex ear drops (Tr. 401). In addition, LDR's sleep obstruction was disrupting the entire household, and it was noted that LDR's ears ached, drained puss, and felt full (Tr. 387, 396). LDR continued to poke his fingers in his ears and complain of pain.

In November 2011, in response to LDR's behavioral problems, snoring, restless sleep, and nocturnal enuresis, Dr. Ansari conducted a nocturnal polysomnography sleep study (Tr. 290, 346). Dr. Ansari documented mildly reduced sleep efficiency and moderate obstructive sleep apnea.

Dr. Collins similarly reported that LDR was having problems snoring (Tr. 392). It appeared that LDR's tonsils and adenoid tissue may have obstructed greater than 80% of his nasopharynx (Tr. 329, 410). Dr. Collins' recommended that LDR have an adeno-tonsillectomy (removal of the tonsils and adenoids) for his sleep obstruction in an attempt to help LDR "get quality sleep" (Tr. 390).

In December 2011, Dr. Lapadat noted that while LDR's growth and development were normal, he suffered from intermittent mild asthma, a behavioral problem, and a rash (Tr. 305-308). On January 12, 2012, Kirsten M. Turchan, M.D., LDR's dermatologist, diagnosed LDR with scabies (contagious and intensely itchy skin caused by tiny burrowing mites) and prescribed Elimite cream for his recurrent pruritic exanthema (rash) (Tr. 328).

On January 20, 2012, the day of LDR's adeno-tonsillectomy, LDR complained that he could not breathe, and he had congestion in his nose and chest (Tr. 329, 400, 410). He was still using albuterol and orapred (Tr. 304). On January 23, 2012, x-rays revealed small airways disease without focal abnormality (Tr. 413). The following day, LDR's hearing before the ALJ was held, after which the ALJ ordered a follow-up psychological exam.[3]

_____

[3]At the time of the hearing, the only medical records that the ALJ had for LDR pre-dated January 2011 (Tr. 35). Thus, once Ms. Wagner identified LDR's treating physicians during the hearing, the ALJ requested LDR's additional medical records and made those documents part of the record in this case, as summarized herein (Tr. 290-419, Ex. 15F–21F). The ALJ advised Ms. Wagner by way of a letter dated February 27, 2012, that these records would be considered (Tr. 420-421).

On January 30, 2012, ten days post-surgery, LDR's medical records reveal that he still breathed heavily, snored loudly while sleeping, and coughed at night (Tr. 380-382). LDR was expected to follow up with Dr. Collins in April.

On February 22, 2012, Clinical Psychologist Craig A. Nordstrom conducted a consultative examination of LDR (Tr. 416-419). It was noted that LDR presented with fair to poor attention and concentration, and that he performed more strongly in the structured setting of an intellectual assessment. LDR's speech was mostly understandable and relevant, but he was noted as being very impulsive at times. Upon administration of the Wechsler Preschool and Primary Scale of Intelligence test (WPPSI-III), LDR's full scale IQ score corresponded with the 13th percentile and the low average range of intellectual functioning. LDR was diagnosed with disruption behavior disorder NOS.

## B.    Hearing Testimony

At the hearing on January 24, 2012, LDR's mother and Aunt Malinda Hence testified (Tr. 30-62). Prior to testifying, Ms. Wagner waived her right to be represented.[4] The ALJ then explained the step-by-step process that would be used to reach a decision in LDR's case, to which Ms. Wagner indicated she had no follow-up questions (Tr. 34-35). Despite Ms. Wagner's admittedly not having received or reviewed the evidence possessed by the ALJ for her son's

---

[4]At the outset of the hearing, the ALJ specifically advised Ms. Wagner of the following facts with respect to her right to be represented: that a representative could help her present evidence, explain medical terms, and make requests to protect her rights; that a representative could charge only a fee that was approved by the Commissioner; that fees were typically paid only upon winning the case and were then limited to 25% of past-due benefits or $6,000; that expenses could be charged and some organizations offered free representation for qualifying individuals; and that without a representative, the ALJ would help obtain any additional medical or non-medical records that were necessary and relevant to LDR's case (Tr. 33). Ms. Wagner then signed waiver forms which also included similar details about her right to be represented (Tr. 112-113).

case, this evidence (as summarized herein) was admitted into the record and the hearing proceeded that same day (Tr. 35).

Ms. Wagner explained that LDR recently had his tonsils and adenoids removed, and that since the surgery LDR still needed his breathing treatments (nebulizations) five times, and he was suffering from a fever for which he was given Tylenol with codeine, amoxicillin, and omnicef. She explained LDR's history of problems with tracheomalacia, sleep apnea, breathlessness, and ear infections resulting in bilateral ear tube placement. Since then, LDR's speech improved, but his asthma and sleep apnea became worse. On a good day, LDR received his breathing treatment once a day; but when he experienced a flare-up, he needed treatment as much as five times a day. According to Ms. Wagner, LDR slept poorly—sleeping only a few hours at a time due to his breathing problems or acting out (fighting) while sleeping. She testified that LDR was given steroids for his breathing problems.

Ms. Wagner explained that during the day, LDR was sleepy and still banged his head and pulled his hair out. She expressed her frustration with LDR's aggressive and disruptive behavior, and explained that his attention span was no more than two minutes and he did not follow directions. She testified that she never had as many problems with her three older children, and that LDR's temper tantrums made her fear for his safety. She further noted that LDR wet the bed frequently, sweated a lot, and was hyperactive. Ms. Wagner indicated that she hoped to get a referral for LDR to see a developmental specialist.

LDR's aunt testified that LDR stayed with her overnight about once a week. She indicated that LDR slept only a couple of hours and then would wake up two or three times. She testified that LDR was hyperactive, had breathing problems, did not listen, and had a temper that was much worse than that of her other nephews and nieces.

LDR's father wrote a letter also indicating that LDR had a history of asthma and breathing problems as an infant which required medication and breathing treatments. He attested to LDR's frequent ear infections and the progression of his speech after the ear tube placement surgery. LDR's father believed that LDR's breathing and sleeping became worse more recently, and that LDR was limited in his ability to engage in physical activities because of these physical issues. LDR's father further noted that LDR had screaming tantrums.

## C.    The ALJ's Decision

At step one, the ALJ determined that LDR had not engaged in substantial gainful activity. At step two, the ALJ found that LDR suffered from severe impairments including asthma, OSA, language delay, and behavior disorder. At step three, the ALJ reasoned that LDR did not suffer from an impairment or combination of impairments that met, medically equaled, or functionally equaled the severity of any Listing.

With respect to functional equivalence, the ALJ considered the six functional equivalence domains that are used for determining disability in children, and ruled that LDR suffered "no limitation" with respect to moving about and manipulating objects and caring for himself, but that LDR suffered "less than marked limitations" with acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. Because LDR did not suffer from either a "marked" limitation in two domains of functioning or an "extreme" limitation in at least one domain of functioning, the ALJ determined that LDR was not disabled since September 24, 2009, the date his application was filed.

### III.  Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review.  *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, this Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision.  *Id*.  An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings.  *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.  *Lopez*, 336 F.3d at 539.  Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ

must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Furthermore, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Under supplemental security income rules, a child is disabled if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" that "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). This assessment requires a three-step analysis set forth in 20 C.F.R. § 416.924(a). *Jelinek v. Astrue,* 662 F.3d 805, 809–10 (7th Cir. 2011). First, if the child is engaged in substantial gainful activity, the ALJ will deny the claim. *Id.* Second, if the child does not have a severe medical impairment or combination of impairments, then he is not disabled. *Id.* Third, the child's impairments must meet, medically equal, or functionally equal any of the Listings contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.*

The contested issue in this case is whether LDR functionally equaled any of the Listings. To determine if an impairment is "functionally equivalent" to a Listing, an ALJ analyzes its severity in six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1); *see Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Sanchez v. Barnhart*, 467 F.3d 1081, 1082 (7th Cir. 2006) (since children do not generally have work history, the structure of the disability program for them necessarily differs from that for adults, and focuses on the functioning of the

child in specified areas of life activity). To functionally equal a Listing, the ALJ must find an "extreme" limitation in one category or a "marked" limitation in two categories. 20 C.F.R. § 416.926a(a), (e)(2)(i).

A "marked" limitation exists when the impairment seriously interferes with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). With a child that has not attained age 3, a "marked" limitation is generally found if the child is functioning at a level that is more than one-half but not more than two-thirds of his chronological age when there are no standard scores from standardized tests in the case record. 20 C.F.R. § 416.926a(e)(2)(iii). With respect to the sixth domain of functioning, health and physical well-being, a "marked" limitation is generally found if a child is frequently ill because of his impairment or has frequent exacerbations of his impairment that result in significant, documented symptoms or signs. 20 C.F.R. § 416.926a(e)(2)(iv). For purposes of this domain, frequent means (in relevant part) that the child has episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks. *Id*.

An "extreme" limitation exists when a child's "impairment interferes very seriously with [his] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). And for the domain of health and physical well-being, an extreme limitation may be found when episodes of illness or exacerbations result in significant, documented symptoms or signs substantially in excess of the requirements for showing a marked limitation. 20 C.F.R. § 416.926a(e)(3)(iv).

LDR's counsel argues that the ALJ failed to build a logical bridge with respect to the ALJ's findings in the following functional domains: interacting and relating with others, caring

for oneself, and health and physical well-being.[5]  While the Court agrees that error occurred, a more fundamental problem with the ALJ's findings actually affects the entirety of the ALJ's "functional equivalence" determination.  More specifically, remand is required because ALJ Fisher *never once* explained the weight afforded to any medical opinion, except to state in conclusory fashion that the reviewing state agent opinions of December 2009[6] and February 2011 were given greater weight than the hearing testimony (Tr. 25).  In addition, the ALJ "cherry-picked" evidence of non-disability while failing to explain how evidence supporting a finding of disability affected the ALJ's decision.

In assessing functional equivalence for children, 20 C.F.R. § 416.926a indicates that the ALJ is required to consider all of the evidence of record, including all relevant information from medical sources, *see id.* at § 416.924a(a), and the ALJ is required to weigh the various medical opinions, *see id.* at § 416.929 ("If you are a child, we will also consider all of the evidence presented, including evidence submitted by your treating, examining, or consulting physician or psychologist, . . . Section 416.927 explains in detail how we consider and weigh treating source and other medical opinions . . .").  And consistent with Section 416.927(c) and (d), if an ALJ does not give treating source opinions controlling weight, then the ALJ must consider various listed factors (such as the nature and extent of the treatment relationships and the supportability

---

[5]Claimant's counsel also questions whether Ms. Wagner knowingly waived her right to representation when proceeding at the administrative level.  But as indicated herein, Ms. Wagner was advised of her right to counsel on multiple occasions and these advisements seemingly coincided with the Commissioner's responsibilities. *See* 42 U.S.C. § 406(c); 20 C.F.R. § 404.1706.  In any event, because this case necessarily requires remand on other grounds, the issue need not be further explored.

[6]Even in mentioning the state agent opinions, the ALJ incorrectly noted that the first review took place in December 2010 (Tr. 25), when in fact it occurred in December 2009 (Exhibit 9F).

and consistency of the opinions), and "explain in the decision the weight given" to opinions from both treating and nontreating sources, *id*. at § 416.927(e)(2)(ii). More weight is generally given to the opinion of a specialist about medical issues related to the specialist's area of speciality. *Id*. at § 416.927(c)(5). Ultimately, if the ALJ discounts the opinion of a claimant's treating physicians, the ALJ must offer "good reasons" for doing so. *See Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); *see also, Harlin v. Astrue,* 424 F. App'x 564, 567 (7th Cir. 2011).

In this case, while discussing each of the six domains of functioning, the ALJ formalistically summarized various medical records but never meaningfully discussed the record evidence by articulating specific reasons for accepting or rejecting the medical evidence.[7] As a result, the Court finds itself struggling to conduct a meaningful review of the ALJ's decision. *See e.g., Scott v. Barnhart*, 297 F.3d 589 (7th Cir. 2002) ("We require that an ALJ build an 'accurate and logical bridge from the evidence to [his] conclusion' so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review.") (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)). In other words, ALJ Fisher's technical recitation of the medical findings without explaining the weight afforded to the doctors' opinions and their records, violates the regulations' requirements and renders the ALJ's opinion virtually unreviewable.

On review, it is possible to infer that the ALJ gave the most weight to treating pediatrician Dr. Lapadat's opinions because the analysis for each of the six functional domains contains a similar conclusory statement that page 2 of exhibits 5F and 13F supports the determination that there are "no issues that prevent [LDR] from functioning normally in an age-

---

[7]While the ALJ often explained why the hearing testimony was discounted, she did not offer any such explanation with respect to the medical opinions of record.

appropriate manner." (Tr.18, 19, 21, 22, 23, 25). But page 2 of exhibits 5F and 13F represent nothing more than two one-page letters authored by Dr. Lapadat (dated November 4, 2009 and December 8, 2010), which summarily concluded that LDR should function fine even with his chronic issues. These letters fail to identify any examination findings upon which Dr. Lapadat's opinions are rendered.

But assuming for the sake of argument that ALJ Fisher intended to rely heavily on Dr. Lapadat's conclusions in this respect, she then needed to explain why it is that the various other medical opinions of record were afforded less weight and why the other medical records did not support a finding that LDR was further limited by his chronic ear problems and asthma, and resulting sleep and behavioral issues.

For instance, Dr. Lapadat's November 4, 2009 conclusion that LDR was expected to lead a healthy and normal life, was rendered within weeks of three consultative examinations which collectively revealed that: LDR was suffering from chronic otitis media, asthma, and significant speech delay; LDR was lagging behind more than 95% of his age mates in social, behavioral, and psychological functioning; and, LDR was suffering from cognitive disorder. Although the ALJ mentioned in passing some of the results from these consultative examinations, the ALJ never acknowledged that these various records were inconsistent with Dr. Lapadat's opinion. In addition, the ALJ failed to explain in detail how she considered and weighed the consultative medical opinions (which undoubtedly supported LDR's being further limited by his ailments such that he was functioning at a much lower level than unimpaired children of his age).

Similarly, when Dr. Lapadat authored his December 8, 2010 letter summarily concluding that LDR did not have any issues that prevented him from functioning normally, LDR's medical records from treating specialists showed that despite having ear tube placement surgery in

November 2009, LDR continued experiencing repeated ear problems and would soon be put on steroids for his ongoing asthmatic exacerbation. By the end of 2011, LDR's sleeplessness and behavioral problems also required further medical attention, and LDR ultimately underwent another surgery. But again, the ALJ never explained why Dr. Lapadat's December 2010 conclusion was reliable despite these subsequent medical records evidencing LDR's persistent medical and behavioral problems. *See* 20 C.F.R. § 416.927. And for the purpose of this Court's review, the ALJ never bothered to explain the value afforded to LDR's treating physician records or discuss why these records didn't support LDR's claim that he suffered from limitations which seriously interfered with his functioning (especially with respect to his health and physical well-being, *see* § 416.926a(e)(2)(iv)). *See e.g.*, *Jelinek*, 662 F.3d at 811 ("When an ALJ decides to favor another medical professional's opinion over that of a treating physician, the ALJ must provide an account of what value the treating physician's opinion merits.").

Furthermore, to the extent that ALJ Fisher wanted to rely on the reviewing state agents' opinions who opined in December 2009 and February 2011 that LDR did not functionally meet a Listing, she needed to offer some explanation as to why LDR's medical records—revealing significant evidence of LDR's ongoing problems—didn't evidence further impairments within the six functional domains. In fact, the ALJ never even acknowledged that the state agents formulated opinions without ever having reviewed many of LDR's medical records—records which weren't sought by the Commissioner until January 2012 (Exhibits 15F-20F). *See, e.g.,* SSR 96-6p; *Staggs v. Astrue*, 781 F.Supp.2d 790, 794-96 (S.D. Ind. 2011) (finding that the medical record omitted from review provided significant substantive evidence regarding the claimant's medical impairments and that any medical opinion rendered without taking this subsequent record into consideration was incomplete and ineffective). So in relying on the

reviewing state agents' opinions, the ALJ at least needed to offer some explanation for how these opinions would likely not have been affected by the additional significant evidence of LDR's ongoing impairments. *Id*.

A final shortcoming of the ALJ's opinion bears mentioning. Consistent with 20 C.F.R. § 416.926a(a), an ALJ is to assess a child's functional limitations by considering "the effects of structured or supportive settings" and "the effects of . . . medications or other treatment." 20 C.F.R. § 416.926a(a)(1), (a)(3).

With respect to the requirement that the effects of a structured or supportive setting be considered, the ALJ noted several times that in a clinical structured examination setting, LDR displayed age appropriate functioning (Tr. 19, 21). Based on this evidence, the ALJ opined that LDR had less than marked limitations with attending and completing tasks and interacting and relating with others. But the ALJ failed to identify the evidence supporting her conclusions with respect to how LDR would function absent the structured settings. For this reason, remand is also required. 20 C.F.R. § 416.924a(b)(5)(iv) (noting that even if a child's symptoms or signs are controlled or reduced in a structured setting, it must be considered how the child would function without the structure or supportive setting).

With respect to the need to consider the effects of treatment, the ALJ speculated that LDR was "expected" to show improvement following his January 2012 adeno-tonsillectomy (Tr. 25 (citing Exhibit 20F, page 13)). But the ALJ's speculation as to the likely outcome of LDR's surgery, especially when based on a treatment note recorded *before* the surgery ever took place, is not sufficient evidence to support the ALJ's opinion. And while remand is necessary for the other reasons detailed in this case, the Court would note that treatment notes from November and December 2012 evidenced LDR's ongoing ear, speech, and behavioral problems resulting in a

medically recommended second ear tube replacement surgery and referral for an Audiology and

Comprehensive Test (Tr 432-440).[8]  Accordingly, on remand, the ALJ shall either order an

updated physical examination of LDR, *see* 20 C.F.R. § 416.919a, or at least explain why one is

not necessary. *See Wilcox v. Astrue,* 492 F. App'x 674, 678 (7th Cir. 2012) (the need for

additional tests or examinations will normally involve a question of judgment, and the court

generally defers to the ALJ's determination whether the record before her has been adequately

developed).

The type of inadequate discussion engaged in by the ALJ with respect to the relevant

medical records and opinions of record, and the failure of the ALJ to build an accurate and

logical bridge from the evidence to her conclusions with respect to LDR's level of functioning in

each of the domains, cannot provide the substantial evidence needed to affirm the ALJ's

determination. *See Lopez*, 336 F.3d at 539.

## V.  Conclusion

For the foregoing reasons, the record does not command a determination that LDR

should be awarded benefits, but the ALJ has not adequately supported her conclusions and so the

Court GRANTS the claimant's request to remand the ALJ's decision. [DE 1.]  Accordingly, the

Court now REMANDS this case to the Commissioner for further proceedings consistent with

this Opinion and Order.  To the extent counsel seeks an award of fees, he shall file a separate

motion along with affidavits supporting the award sought.

---

[8]These records were submitted by Ms. Wagner and reviewed by the Appeals Counsel in denying review (Tr. 6). *See Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997) ("we review the ALJ's determination as well as any new evidence which the Appeals Council may have determined to be immaterial.").

SO ORDERED.

ENTERED:  March 17, 2015

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court